**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **JAMIE LYNN RUBOTTOM-LANGENECKERT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 1:20CV188 SNLJ** |
| | ) | |
| **KILOLO KIJAKAZI,** [1] | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM and ORDER**

The Commissioner of the Social Security Administration denied plaintiff Jamie

Rubottom-Langeneckert's application for Disability Insurance Benefits under Titles II

and XVI of the Social Security Act.  Plaintiff now seeks judicial review.

**I.      Procedural History**

Plaintiff was born in 1981.  She graduated from college and worked for 13 years

as a registered nurse.  She has four children: a daughter who lives with her ex-husband,

and three sons born in 2012, 2014, and 2017 from a relationship with her boyfriend.

Plaintiff alleges her disability began February 26, 2014 due to preeclampsia, attention

deficit disorder, social anxiety, panic attacks, depression, and post-traumatic stress

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant
to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is substituted for Andrew
Saul as the defendant in this suit.

1

disorder.  Plaintiff's application was denied at the initial determination level.  She then

appeared before an Administrative Law Judge ("ALJ"), who found that plaintiff had

severe impairments including attention-deficit hyperactivity disorder, depression, and

anxiety [Tr. 80].  However, the ALJ found that those impairments did not meet or equal a

listed impairment.

The ALJ then determined that plaintiff retained the residual functional capacity

("RFC")

> to perform a full range of work at all exertional levels but with the
> following nonexertional limitations:  the claimant can perform work
> involving simple, routine tasks and simple work-related decisions.  She can
> perform low stress work, defined as work that involves no interaction with
> public, no handling of customer complaints, only occasional decision
> making, and only occasional changes in the work setting.

[Tr. 82-83.]

The ALJ found that plaintiff's impairments would not preclude her from

performing work that exists in significant numbers in the national economy, including

work as a dishwasher, packager, and automobile detailer.  Thus, the ALJ found plaintiff

was not disabled.

Notably, the ALJ advised plaintiff during the hearing that she was entitled to an

attorney or other assistance and asked if she wished to proceed with the hearing or stop

and obtain counsel.  Plaintiff chose to continue without counsel.

Plaintiff has exhausted her administrative remedies, and the ALJ's decision stands

as the final decision of the Commissioner subject to judicial review.

## II.     Disability Determination—Five Steps

A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant has a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]"  *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner follows a five-step sequential process when evaluating whether the claimant has a disability.  20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1).  First, the Commissioner considers the claimant's work activity.  If the claimant is engaged in substantial gainful activity, the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 20 C.F.R. §§ 404.1520(c), 404.1520a(d), 416.920(c), 416.920a(d).

Third, if the claimant has a severe impairment, the Commissioner considers the impairment's medical severity.  If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, the claimant is considered disabled, regardless of age, education, and work experience.  20 C.F.R. §§ 404.1520(a)(4)(iii), (d); 416.920(a)(3)(iii), (d).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, the Commissioner assesses whether the claimant retains the "residual functional capacity" ("RFC") to perform his or her past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(5)(i), 416.920(a)(4)(iv), 416.945(a)(5)(i).  An RFC is "defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations."  *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotations omitted); *see also* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). While an RFC must be based "on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," an RFC is nonetheless an "administrative assessment"—not a medical assessment—and therefore "it is the responsibility of the ALJ, not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831F.3d 1015, 1020 (8th Cir. 2016). Thus, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).  Ultimately, the claimant is responsible for *providing* evidence relating to his RFC and the Commissioner is responsible for *developing* the claimant's "complete medical history, including arranging

4

for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources."  20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).  If, upon the findings of the ALJ, it is determined the claimant retains the RFC to perform past relevant work, he or she is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC does not allow the claimant to perform past relevant work, the burden of production to show the claimant maintains the RFC to perform work that exists in significant numbers in the national economy shifts to the Commissioner. *See Bladow v. Apfel*, 205 F.3d 356, 358–59 n.5 (8th Cir. 2000); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, the Commissioner finds the claimant not disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)( v).  If the claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled.  *Id.*  At Step Five, even though the *burden of production* shifts to the Commissioner, the *burden of persuasion* to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

## III.    The ALJ's Decision

At Step One, the ALJ found plaintiff met the insured status requirements through June 30, 2019 and that she had not engaged in substantial gainful activity since February 26, 2014. At Step Two, the ALJ found plaintiff suffers from three severe impairments: (1) attention-deficit hyperactivity disorder ("ADHD"), (2) depression; and (3) anxiety. The ALJ rejected that diagnoses of obesity and obstructive sleep apnea constituted severe

impairments.  Similarly, the ALJ found that despite several references to fibromyalgia in the medical records, there was no evidence showing plaintiff exhibits symptoms associated with that impairment needed for the determination that it constituted a medically determinable impairment.

At Step Three, the ALJ concluded plainitff does not have an impairment or combination of impairments that meets or equals one of the presumptively disabling impairments listed in the regulations.

Next, in Step Four, the ALJ determined Smith's RFC.[2]  As noted, the ALJ found that plaintiff

> Has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  the claimant can perform work involving simple, routine tasks and simple work-related decisions.  She can perform low stress work, defined as work that involves no interaction with public, no handling of customer complaints, only occasional decision making, and only occasional changes in the work setting.

[Tr. 82-83.] As part of this determination, the ALJ found plaintiff's medically determinable impairments could reasonably be expected to cause symptoms.  However, the ALJ also found that her allegations about her physical symptoms' intensity,

---

[2] In the past, there has been some confusion as to when the RFC is determined, which affects who holds the burden of proof in establishing an appropriate RFC. In this Circuit, it has been held that "the RFC is used at both step four and five of the evaluation process, but it is determined at step four, where the burden of proof rests with the claimant." *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (*quoting Young v. Apfel*, 221 F.3d 1065, 1069 n. 5 (8th Cir. 2000)); *see also Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014) ("Steps 4 and 5 require the ALJ to determine a claimant's RFC[.]").

persistence, and limiting effects are not entirely consistent with the medical evidence and other evidence in the record. [Tr. 83.]

The ALJ wrote that plaintiff has a "history of treatment for depressive disorder, anxiety, and attention deficit hyperactivity disorder. She was hospitalized twice in December 2014 for suicidal ideations, but this appeared to be secondary to domestic violence stressors.  Her hospital notes also indicated that substance use was involved." [Tr. 83.] The ALJ further characterizes plaintiff as having "received extremely intermittent outpatient psychiatric care with Advanced Psychiatric Services from 2013 through April 2016." [Tr. 84.] The ALJ observed that the record notes reflect ongoing anxiety, stressors with family and problems with stress, but that "her mental status examinations were predominantly normal." [*Id*.]  The plaintiff received medication management through her primary care provider between April 2016 and August 2017, and the physician noted that plaintiff had reported situational stressors, including finances. Plaintiff's primary care provider referred her to psychiatry, but she did not see anyone until September 2017, when she was one week postpartum. At that time, plaintiff presented to psychiatrist Dr. Mukherji with worsening anxiety and requested refills of her high dose Adderall and Xanax. On examination, plaintiff demonstrated good eye contact, but she was confrontational and guarded. She told the psychiatrist that she had last been seen at Advanced Psychiatric Services in April 2016, but that they would not see her after that. Plaintiff apparently reported some improvement on her follow up visit with the psychiatrist on October 4, 2017, but she did not return after that visit.

Next, plaintiff was seen at PCMH Counseling Center. Those records document three visits in January 2018, April 2018, and July 19, 2018. A notation indicated that plaintiff had a history of seeing multiple physicians for the same medications and asking for benzodiazepines. On September 11, 2018, plaintiff established care with a new doctor, Dr. Erica Leung.  Plaintiff reported that she obtained some of her clonazepam through the emergency rooms to get her through her period without treatment. Dr. Leung indicated that she started plaintiff on duloxetine for depression, but when Dr. Leung searched databases, she discovered that plaintiff had three prescriptions filled for clonazepam since August 27, 2018 from three different providers, so no new prescription was given plaintiff was again referred to psychiatry.

The ALJ noted plaintiff followed up with Dr. Leung on February 4, 2019 and indicated she was now seeing a psychiatrist and doing well.  Plaintiff began counseling at Painte Basse Family Health Care.  The ALJ obtained medical records post-hearing for an inpatient stay from March 13-18, 2019.  There, the plaintiff voiced increased anxiety and suicidal ideation, but the ALJ emphasized that she had many failed health care appointments and plaintiff's focused on being prescribed Xanax and Adderall.

Next, the ALJ observed that the focus of plaintiff's hearing testimony appeared to "center on primarily situational issues, including legal issues, ongoing lawsuits, arrest, and conflict with her boyfriend's parents. These issues were also at the forefront of her behavioral treatment notes and counseling records…."  [Tr. 85.]  Dr. Mukherji wrote on September 21, 2017 her concern that some of claimant's "extensive legal problems and recent life chaos might be substance related."  [*Id.*] A drug screen was ordered, and the

8

ALJ noted that plaintiff tested positive for oxycodone and amphetamines. Plaintiff however inconsistently testified at the hearing that she had no substance use issues.

At the hearing, the plaintiff read a largely nonsensical statement into the record. The ALJ wrote "this statement was considered; however, there is no evidence of psychosis in her medical records. Her mental health treatment notes document that she presented with logical and goal directed thought processes and normal cognition, and no mention of any response to internal stimuli." [Tr. 86.]

Based on the RFC determination, the ALJ determined plaintiff cannot perform any past relevant work.

At Step Five, the ALJ analyzed whether plaintiff can successfully adjust to other work in light of plaintiff's age, education, work experience, and RFC.  The ALJ relied on vocational expert ("VE") testimony that plaintiff is able to perform such jobs as a dishwasher, packager, and automobile detailer.  The ALJ then found these jobs exist in significant numbers in the national economy and concluded plaintiff is not disabled. (Tr. 28-29).

## IV.    Standard of Review

The Court must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. §§ 405(g); 1383(c)(3). Substantial evidence is less than a preponderance of the evidence but enough that a reasonable person would find it adequate to support the conclusion.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the [Commissioner's] findings."

*Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (alteration in original) (*quoting Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987)).  The Court must also consider any evidence that fairly detracts from the Commissioner's decision.  *Id.*  "[I]f there is substantial evidence on the record as a whole, [the Court] must affirm the administrative decision, even if the record could also have supported an opposite decision."  *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992). In reviewing whether the ALJ's decision was supported by substantial evidence, this Court does not substitute its own judgment for that of the ALJ—even if different conclusions could be drawn from the evidence, and even if this Court may have reached a different outcome. *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).

## V.      Discussion

The question in this social security appeal is whether substantial evidence supports the ALJ's decision that plaintiff is not disabled under the Social Security Act.  In sum, the ALJ found plaintiff's allegations of disability were inconsistent with her generally normal mental status examinations, her good response to therapy and other treatment, her activities of daily living including having primary responsibility for raising three young children, and with evidence of noncompliance, drug use, and drug-seeking behavior.  The Commissioner argues that because the "substantial evidence" standard is highly deferential, and because the record before the ALJ permits the inferences and conclusions that the ALJ made, that this Court should affirm.

Plaintiff, who, again, is *pro se*, has filed numerous documents with the Court. Many of those documents have been returned to her as inappropriately filed craft

projects, letters from children, and other "evidence" not properly before the Court. Plaintiff submitted handwritten memoranda that are best described as gibberish.  It is impossible to glean facts or arguments from the memoranda.  This Court denied plaintiff's request for an attorney early in the case because plaintiff had not described what efforts she had made to obtain an attorney on her own. [Doc. 21.]  This Court promised to remain attentive to whether plaintiff had need for an attorney, however, and the Court has now appointed an attorney to represent plaintiff.

  After careful review of the record, the Court has several questions regarding whether substantial evidence supports the ALJ's determination.

   A.    "Normal mental status" and "no evidence of psychosis"

The Commissioner contends that the ALJ was correct that the record reflects only intermittent treatment and generally good response to therapy.  The ALJ also states that there is "no evidence of psychosis in [plaintiff's] medical records." [*Id.*]  The opinion, however, glosses over plaintiff's inpatient hospital stays, and it does not mention two 2018 admissions at all.  The opinion discusses plaintiff's first[3] (December 2014) hospitalizations only briefly, and the ALJ characterizes them as involving substance use and as having been "for suicidal ideation…secondary to domestic violence stressors." [Tr. 83.]  The ALJ also discussed plaintiff's 2019 admission only peripherally.  The details of plaintiff's inpatient stays and emergency room visits are illuminating.

---

[3] As discussed below, although the December 2014 hospitalizations are the first hospitalizations to be included in the medical record, at least one additional hospitalization occurred earlier in 2014.

**December 6-11, 2014:** Plaintiff was admitted from December 6 through 11 for "depression and psychosis." [*See* Tr. 785, 821.]  According to the medical records, plaintiff believed fly larvae were growing in her face and that she was being poisoned by her boyfriend and his family.  She said she believed the boyfriend put cigarette ashes in her purse and that they have fly larvae in them.  She also believed a worm in her purse was causing an infection on her face.  She believed everyone is out to get her and that her children are also being poisoned.  At the time, plaintiff had three children:  a daughter who lived with plaintiff's ex-husband, and two sons (including an infant) whose father is the boyfriend with whom plaintiff lives.  Records indicate that hospital staff spoke with plaintiff's sister, who said plaintiff had trust issues and that she had posed as her own lawyer in court after fashioning a lanyard.  Plaintiff reportedly believed there were helicopters surveilling her, and she refused medications.  The record also states that plaintiff's sister advised that plaintiff had been involuntarily admitted three weeks earlier "at Hyland."[4]  [Tr. 808, 812, 827-39.]

**December 25-30, 2014:**  Just a few weeks later, plaintiff was admitted to the hospital again after she drove to Colorado and was arrested at the gate of a nuclear power plant with her eight-month-old child on her lap.  She said she intended to wreck the vehicle at the power plant.  Records reflect she had "persecutory delusions" in which she believes she is being followed by the FBI, that her husband is attempting to kill her, and she is untrusting of everyone.  Notes indicate that her "Insight into current issues is

---

[4] Notably, there do not appear to be any medical records in the transcript from the November 2014 admission "at Hyland."

impaired severely." She had also been engaging in ritualistic behaviors including collecting bibles, arranging crucifixes in rows and patterns, and arranging toys in rows so that they appear to stare at a particular point of interest. Her sister explained to the hospital staff that the family wanted to obtain a legal guardianship for her, but they were concerned plaintiff would present too well in court. [Tr. 770-803.] The hospital provided the sister with guardianship information. The notes indicate that staff "helped [plaintiff] get rid of the acute psychosis at this time," but "she may relapse and need admission again." [Tr. 803.]

**August 9, 2015:** Plaintiff presented to the emergency room with injuries to her ribs, neck, and head. Records state that the security officer says they have dealt with her multiple times and have seen her beat herself up and then blame the boyfriend. [Tr. 761.]

**November 15, 2015:** Plaintiff was brought to the emergency room after being found passed out drunk on the street after a night of drinking. She refused treatment and was escorted out by security after verbally abusing staff. Her diagnosis included "personality disorder." [Tr. 670.]

**November 5, 2016:** Plaintiff presents to emergency room with anxiety after losing relationship with her psychiatrist three months before. Diagnosis includes anxiety, bipolar disorder, depression with psychosis, mood disorder, drug effect, intoxication. [Tr. 745.]

**November 21, 2016:** Presented to emergency room with injuries from alleged assault by boyfriend. She says she did not call the police because she says she called them earlier in the week for the same thing but they didn't believe her. Notes say that

plaintiff was seen multiple times in the ER since June after alleged assaults by her boyfriend.  [Tr. 736.]

**March 3, 2017:**  Plaintiff was brought to the emergency room by ambulance. She states she was evicted by her boyfriend and slept at her mother's house, but then her mother kicked her out in the morning, so she slept under a tree until someone called an ambulance.  She admitted to use of methamphetamines and also stated that her children were in custody of DFS. [Tr. 711.]

**June 20, 2017:**  Plaintiff is again pregnant and says she has been homeless since March, staying with family, friends, and with her boyfriend on and off.  [Tr. 704.] She went to the hospital because of her worsening anxiety and because she no longer feels safe at home because her boyfriend kicked her out again.  Plaintiff's sister told the social worker that plaintiff's post-partum depression has become worse with every successive pregnancy.  Brother told the social worker that plaintiff hits her boyfriend and blames everyone for her problems.  Neither sibling was able to accept custody of plaintiff, and plaintiff refused to go to a shelter despite the hospital's apparent efforts to arrange for her care.  [Tr. 701-03.]

**July 28-August 2, 2018:**  Plaintiff was admitted as an inpatient because she has been suicidal, paranoid, and confused for a few days before admission.  She feels anxious and that something is wrong with her "internally."   She cannot recall the names of her medications and complains of abuse by her boyfriend, the stress of finances, and the stress of taking care of her children.  Notes say to "rule out delirium."  [Tr. 1221.]

14

**September 5-9, 2018:**  Plaintiff admitted for anxiety, depression, panic attacks, and suicidal ideations.  She reported that her medications are not working and that she had had increasing panic attacks.  During this hospital stay, she says that her family is supportive.  [Tr. 1341, 1353, 1389.]

**September 18-20, 2018:**  Plaintiff is again admitted to the hospital for delusional thought content and expressed homicidal ideations and plans.  [Tr. 1411.]

**March 13-18, 2019:**  Plaintiff is admitted to the hospital for anxiety and depression. She states that her kids are "being cared for by parents."  [Tr. 1539.]

*       *       *

The ALJ supported his opinion that objective medical evidence did not support allegations of disabling mental health symptoms in several ways.  He opined that plaintiff's "extremely intermittent" mental health care from 2013 to 2016 reflected that her mental status exams were predominantly normal.  [Tr. 84.]  He also stated that there was "no evidence of psychosis."  [Tr. 86.] But the record does not appear to permit these conclusions.  Plaintiff's delusions and paranoia and relatively frequent suicidal and homicidal ideations are amply reflected by the medical records.  Plaintiff's medical record even states she was hospitalized for "psychosis" and her diagnosis has included "depression with psychosis."  [Tr. 745, 785, 803.]

The Commissioner supports the not-disabled conclusion by describing plaintiff's treatment as "intermittent," citing to a single practice's treatment records from March 2013 to April 2016, and characterizing the records as depicting a "predominantly normal mental status."  Although it is true that failure to seek treatment over a long period would

15

support a finding of not-disabled, *see Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015), that is not the case here.  Plaintiff appears to have attended appointments with her psychiatrist every three months during that time, and worsening symptoms appear to precede the times she had to be hospitalized.  [Tr. 686.]  Notably, the records begin while plaintiff is still working as a nurse, and the records from that practice end for no obvious reason three years later. Those records also indicate that plaintiff is consistently "moderately ill" with either no-change or worsening symptoms, even on her medications, with limited insight and judgment and an anxious or "quite anxious" presentation. [E.g., Tr. 674, 675, 677, 679, 680, 682, 683, 687.]  This does not support the conclusion that plaintiff had mainly normal mental status reports.

As for the Commissioner's argument that plaintiff has had good therapy results, the ALJ suggests plaintiff was largely noncompliant with her medications and that, when she did take medications, they controlled symptoms.  But the record also reflects the medications were not consistently effective.  She was hospitalized in 2018 after reporting her clonopin was not working [Tr. 1341], and her frequent pregnancies rendered her ineligible for the use of certain medications not indicated during pregnancy or breastfeeding.  [Tr. 1097, 1101.]  In addition, even when on medications that worked for some symptoms, her family doctor indicated that her anxiety and agoraphobia were not controlled as late as February 2019.  [Tr. 1295.]  That was just before her March 2019 inpatient visit and three months before her hearing.  Such evidence does not support the Commission's argument that only subjective reports supported uncontrolled symptoms. [*See* Doc. 31 at 7-8.]

16

In addition, plaintiff's medical records repeatedly refer to a "personality disorder" or "bipolar disorder."  [Tr. 670, 717, 1170.]   These conditions are not well-explored in the medical record, and the ALJ appears not to have considered the issue.

## B.   Responsibility for children

The ALJ relied on the fact that plaintiff was the is "able to live with others and spends time interacting with her children" and that she "care[s] for children."  [Tr. 82.] The Commissioner characterized plaintiff as the "primary parent raising three young children" as justification for the ALJ's disability determination.  [Doc. 31 at 8.]  Both of those characterizations appear to overstate the record. Plaintiff's ability to "live with others" is belied by her frequent evictions from her home due to "symptoms." [Tr. 827, 702.]  The record shows that plaintiff was repeatedly in jail[5] [Tr. 719, 1095, 1100, 1170], was homeless [Tr. 711, 701], or that her children were in custody of others [Tr. 682, 711, 739, 828, 1539] throughout the relevant period.  It thus appears plaintiff's care of her children was intermittent, though much is unclear.

## C.   Other considerations

This Court is mindful that its role is to determine whether the ALJ's decision is supported by "substantial evidence."  Substantial evidence is "'more than a mere scintilla.' It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Berryhill v. Biestek*, 139 S. Ct. 1148, 1154 (2019) (quotation omitted).  This Court must also consider any evidence that fairly

---

[5] This Court wonders whether the gaps in plaintiff's treatment records may be explained by jail time and moving around the country.  [*See* Tr. 1100 for history as recorded by a provider.]

detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770.  To the extent it is possible to draw two inconsistent positions, and one represents the agency's findings, this Court must affirm. *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017).  This Court concedes that there is evidence to support the ALJ's findings that plaintiff was at times drug-seeking, that she was noncompliant with medication, and that her symptoms were sometimes well-controlled.  But the record simply does not support the ALJ's findings that there was "no evidence of psychosis" in the record or that plaintiff actually acted as the primary parent for three young children, particularly in light of her recurring psychological symptoms and her repeated evictions from the home.

The Court must note here that plaintiff and, indeed, the entire process, would have benefitted if plaintiff had had some sort of advocate during her disability application process.  Although a consultative examination was attempted in January 2018, the report states that plaintiff failed to return documents and phone calls.  The evaluation states "calls were made to 3P who provided a new number, messages were left, no response. 3P agreed to have claimant return my call and he would follow up with her as well.  No response from either.  Follow up letters were sent with no response.  Due to lack of evidence, it is not possible to evaluate claimant's functional limitations."  [Tr. 182.]  The Commissioner observes that "the claimant bears the burden of proving disability and providing medical evidence regarding the existence and severity of an impairment."  *See Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013); *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009).  It appears plaintiff was going through the Social Security application process alone, and it is not at all clear whether plaintiff received messages

from the examiner or the unidentified third-party with whom the examiner spoke.  The consultative exam and other open matters in the record—plaintiff's undocumented November 2014 hospitalization, her bipolar personality disorder diagnosis, and her mysterious jail stays—might have been addressed if plaintiff had the benefit of an advocate.  As indicated above, it appears plaintiff's family had wanted to obtain legal guardianship over her [Tr. 782], but plaintiff's paranoia and pervasive "trust issues" [Tr. 827] would have impeded that in addition to, perhaps, her inclination to get help for her disability application process.

## VI.   Conclusion

This is a complicated case.  To the extent substantial evidence does not support the ALJ's decisions, this Court would be unwilling to simply award benefits because, in situations in which the plaintiff is disabled but drug use is a concern, certain procedures must be followed.  *See Brueggemann v. Barnhart*, 348 F.3d 689 (8th Cir. 2003), *Kluesner v. Astrue*, 607 F.3d 533 (8th Cir. 2010), and 20 C.F.R. §§ 404.1535(b), 416.935(b).

The Court will thus order further briefing on the Court's concerns regarding the ALJ's decision outlined above, including the effect of potentially missing medical and other records, and the effect, if any, of plaintiff's drug use on a disability finding.

Accordingly,

**IT IS HEREBY ORDERED** that the parties shall file further briefing on the

matters described herein by May 10, 2022.

Dated this 11th day of March, 2022.

_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE

20